UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>ZACHRY HOLDINGS, INC., *et al.*,<br><br>*Debtors*. | Chapter 11<br><br>Case No. 24-90377 (MI) |

| | | |
|---|---|---|
| FLNG LIQUEFACTION, LLC;<br>FLNG LIQUEFACTION 2, LLC; and<br>FLNG LIQUEFACTION 3, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>CB&I INC.;<br>ZACHRY INDUSTRIAL, INC.; and<br>CHIYODA INTERNATIONAL<br>CORPORATION,<br><br>Defendants. | § § § § § § § § § § § § § § | Adversary No. 24-03195 |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

FLNG Liquefaction, LLC; FLNG Liquefaction 2, LLC; and FLNG Liquefaction 3, LLC file this First Amended Complaint against CB&I Inc.; Zachry Industrial, Inc.; and Chiyoda International Corporation, respectfully showing as follows.

### I.   PRELIMINARY STATEMENT

1.     Plaintiffs contracted with Defendants under fixed price, turnkey, engineering, procurement, and construction agreements for the construction of a natural gas liquefaction and liquified natural gas ("LNG") export facility, the details of which are discussed below. Plaintiffs have recently discovered significant defects in the performance of Defendants' work that has caused major damage to key equipment at the LNG facility resulting in substantial repair costs,

1

the shut-down of operations, and other damages. Plaintiffs file this action to recover all damages caused by Defendants failure to comply with their contractual obligations.

## II.   PARTIES

2.      Plaintiff FLNG Liquefaction, LLC ("FLIQ1") is a Delaware limited liability company with its principal place of business in Houston, Texas.

3.      Plaintiff FLNG Liquefaction 2, LLC ("FLIQ2") is a Delaware limited liability company with its principal place of business in Houston, Texas.

4.      Plaintiff FLNG Liquefaction 3, LLC ("FLIQ3") is a Delaware limited liability company with its principal place of business in Houston, Texas.

5.      Defendant CB&I Inc. ("CB&I") is a Texas corporation with its principal place of business in Houston, Texas. CB&I has been served with process and has entered an appearance in this action.

6.      Defendant Zachry Industrial, Inc. ("Zachry") is a Delaware corporation with its principal place of business in San Antonio, Texas. Zachry has been served with process and has entered an appearance in this action.

7.      Defendant Chiyoda International Corporation ("Chiyoda") is a Washington corporation with its principal place of business in Houston, Texas. Chiyoda has been served with process and has entered an appearance in this action.

## III.   JURISDICTION & VENUE

8.      Venue is proper in this Court because the agreements at issue provide that each party "irrevocably submits to the exclusive jurisdiction of any Federal court or Texas state court sitting in Houston, Texas."

9.      This Court has subject matter jurisdiction over this dispute under 28 U.S.C.

1334(b).

10.     This Court has personal jurisdiction over Defendants because they are citizens of Texas by virtue of having their principal places of business in Texas.  Further, Defendants conduct business in Texas, including but not limited to, by entering into contractual relationships and performing work in Texas and maintaining offices and employees in Texas.  Defendants have purposefully availed themselves of the benefits and protections of the State of Texas by establishing minimum contacts here, and this Court's exercise of jurisdiction over Defendants does not offend traditional notions of fair play and substantial justice.  Further, Defendants have consented to personal jurisdiction in this Court.

## IV.    FACTUAL BACKGROUND

### A.    Freeport LNG's Quintana Island Facility

11.     Freeport LNG Development, L.P. ("Freeport LNG") is one of the first and largest exporters of LNG.   With its joint venture partners, Freeport LNG owns and operates an LNG facility located on Quintana Island near Freeport, Texas (the "LNG Facility").

12.     The LNG Facility was previously an LNG import and regasification facility (the "Regas Facility") featuring two 160,000 cubic meter LNG storage tanks, a marine dock that could accommodate the largest LNG tankers in service, and an LNG vaporization system capable of producing over 2 billion cubic feet (Bcf) of gas per day.  Construction on the Regas Facility started in 2005, and commercial operations began in 2008.  However, by the time the import terminal commenced operations in 2008, the North American natural gas industry had begun to experience a sea change—the shale gas revolution.

13.     In 2010, to take advantage of excess domestic natural gas reserves due primarily to improvements in extracting gas from shale, Freeport LNG began a project to transform the Regas

Facility from an import terminal into a natural gas liquefaction and LNG export facility (as defined above, the "LNG Facility").

14.     LNG is natural gas that is super-cooled to transform it from a gaseous state into a liquid for ease and safety of non-pressurized storage and transport.  Natural gas is converted to a liquid in a liquefaction plant that performs a sequence of processes, which is often referred to as "liquefying" the natural gas.  This liquefaction process takes place in processing units that are often referred to as "trains."

15.     The LNG Facility, which currently has three liquefaction processing units, or trains, is the first world-scale electric-powered LNG plant in North America.  Train 1 was commissioned and began commercial operations in December 2019.  Train 2 and Train 3 commenced operations in January and May 2020, respectively.  When operating at full capacity, the output from the Facility's three liquefaction trains is enough to decrease the United States trade deficit by 1-2% alone.

16.     Each liquefaction train at the LNG Facility uses three General Electric 75 MW motors that power three propane and mixed-refrigerant compressors.  The electric motors used at the LNG Facility were selected to allow Freeport LNG to comply with strict local air emissions standards and meet its production and export targets.

**B.     The EPC Contracts**

17.     FLIQ1, FLIQ2, and FLIQ3 are affiliates of Freeport LNG.

18.     FLIQ1 developed the first LNG train ("Train 1").  FLIQ2 developed the second LNG train ("Train 2"), and FLIQ3 developed the third LNG train ("Train 3").

19.     FLIQ1 and FLIQ2 selected CB&I and Zachry, through a joint venture arrangement, to provide all engineering, procurement, construction, pre-commissioning, commissioning, start-

up and testing services for Train 1 and Train 2 on a fixed price, turnkey basis.

20.     On December 10, 2013, FLIQ1 entered into a Fixed Price Separated Turnkey Agreement with CB&I and Zachry for the Engineering, Procurement and Construction of the Freeport Train 1 Liquefaction Project ("Train 1 EPC Contract").

21.     Also on December 10, 2013, FLIQ2 entered into a Fixed Price Separated Turnkey Agreement with CB&I and Zachry for the Engineering, Procurement and Construction of the Freeport Train 2 Liquefaction Project ("Train 2 EPC Contract").

22.     FLIQ3 selected CB&I, Zachry and Chiyoda, through a joint venture arrangement, to provide engineering, procurement, construction, pre-commissioning, commissioning, start-up and testing services for Train 3 on a fixed price, turnkey basis.

23.     On March 24, 2015, FLIQ3 entered into a Fixed Price Separated Turnkey Agreement with CB&I, Zachry, and Chiyoda for the Engineering, Procurement and Construction of the Freeport Train 1 Liquefaction Project ("Train 3 EPC Contract").

24.     The pertinent provisions of the Train 1 EPC Contract, Train 2 EPC Contract, and Train 3 EPC Contract are virtually identical and are referred to collectively in this Complaint as the EPC Contracts.  CB&I, Zachry, and Chiyoda, as applicable, are referred to in the EPC Contracts collectively as "Contractor," and will be collectively referred to as "Contractor" in this Complaint.

## C.     Defendants' Obligations Under the EPC Contracts

25.     The EPC Contracts establish Contractor's substantive performance standards for the Work.  Those substantive performance standards applied to Contractor, as well as each subcontractor it utilized to perform the Work.  Further, Defendants agreed to perform all engineering, design, procurement, manufacturing, and fabrication work for Trains 1, 2, and 3 in

accordance with applicable codes and standards and in accordance with good engineering and construction practices.

26.     Defendants and Plaintiffs acknowledged that subcontractors would be utilized by Defendants to assist them in the completion of the Work, and that Defendants would be fully responsible for the subcontractors.  Specifically, Section 2.3 of the EPC Contracts state:

> "***Owner acknowledges and agrees that Contractor intends to have portions of the Work accomplished by Subcontractors*** pursuant to written Subcontracts between Contractor and such Subcontractors … The provisions of any Subcontract or Sub-subcontract shall not relieve Contractor of any obligations to perform the Work or of its responsibility for each Subcontractor or Sub-subcontractor … ***Contractor shall be fully responsible to Owner for the acts and omissions of Subcontractors and Sub-subcontractors and of Persons directly or indirectly used by any of them, as Contractor is for the acts or omissions of Persons directly employed by Contractor in the performance of the Work***." (emphasis added).

27.     Specifically, Section 2.5C of the EPC Contracts provides that:

> "***Contractor shall perform the Work in accordance*** with Applicable Law and ***Applicable Codes and Standards***, whether or not such Applicable Law or Applicable Codes and Standards came into effect before the Effective Date or during the performance of the Work." (emphasis added).

28.     Section 3.1A of the EPC Contracts provides that:

> "***the Work*** shall be performed on a turnkey basis and ***shall include*** all ***engineering***, ***procurement,*** construction, pre-commissioning, start-up and testing of the Train [1, 2, and 3] Expansion, all ***Equipment***, construction equipment (including materials, apparatus, structures, supplies, tools, machinery, equipment and scaffolding), spare parts, labor, ***workmanship, inspection, manufacture***, ***fabrication***, installation, ***design***, delivery, transportation, storage, training of Owner's operations and maintenance personnel and all other items or tasks that are set forth in Attachment A, or otherwise required to achieve RFSU, RLFC, Substantial Completion and Final Completion of the Train 3 Expansion in accordance with the requirements of this Agreement, including achieving the Minimum Acceptance Criteria and Performance Guarantees." (emphasis added).

29.     Section 3.1A of the EPC Contracts further provides that:

> "***Contractor shall perform the Work in accordance with GECP***, Applicable Law, Applicable Codes and Standards, and all other terms and provisions of this Agreement." (emphasis added).

30.    The EPC Contracts define "Good Engineering and Construction Practices" or "GECP" as:

> "*the generally accepted reasonable and prudent practices, methods, skill, care, techniques and standards* employed by the liquefied natural gas engineering and construction industries with respect to: (i) the *engineering, procurement,* construction, pre-commissioning, commissioning, testing and start-up of LNG storage facilities, natural gas treatment facilities and natural gas liquefaction facilities, all in conformance with Applicable Codes and Standards, Applicable Law, and the standards recommended by the suppliers and manufacturers of Equipment provided hereunder; (ii) personnel and facility safety and environmental protection; (iii) efficient scheduling of the Work; and (iv) the reliability and availability of the Facility under the operating conditions reasonably expected at the Site, as specified in Attachment A." (emphasis added).

31.    Section 3.2A of the EPC Contracts provides that Contractor's specific obligations include to "*procure*, supply, transport, handle, properly store, *assemble*, erect and install all *Equipment*." (emphasis added).

32.    Section 3.2B of the EPC Contracts provides that Contractor's specific obligations include to:

> "provide construction, construction management (including the furnishing of all field supplies, tools, construction equipment, and all Site supervision and craft labor), civil/structural, electrical, instrumentation, field design, *inspection and quality control services required to ensure that the Work is performed in accordance herewith*." (emphasis added).

33.    In addition to Section 2.3 of the EPC Contracts clearly stating that Defendants are fully responsible for the actions and omissions of their subcontractors, Section 3.2D of the EPC Contracts requires that the Contractor "*perform shop and other inspections* of the work of Subcontractors and Sub-subcontractors *to ensure that such work meets all of the requirements of this Agreement*." (emphasis added).  Further, § 3.18 and Attachment EE of the EPC Contracts obligate the Contractor to ensure that Equipment is subject to robust quality control, quality assurance and inspection requirements.

7

34.     Section 3.2R of the EPC Contracts requires that the Contractor "***perform, or cause to be performed, all design and engineering Work in accordance with this Agreement***, including that specified in Section 3.3." (emphasis added).

35.     Section 3.3A of the EPC Contracts provides that:

   "Contractor shall, as part of the Work, ***perform, or cause to be performed, all design and engineering Work in accordance with this Agreement*** and cause the Work to meet and achieve the requirements of this Agreement, including achieving the Minimum Acceptance Criteria and Performance Guarantees." (emphasis added).

36.     The phrasing in Section 3.2R and 3.3A noting "Contractor shall … cause to be performed" clearly indicates that Defendants were obligated to ensure Work performed by subcontractors meet the design and engineering requirements of the Agreement.

37.     Section 3.3C(6) of the EPC Contracts provides that:

   "Owner's review or approval of any Drawings and Specifications (or Owner's lack of comments or written approval thereof) shall not in any way be deemed to limit or in any way alter Contractor's responsibility to perform and complete the Work in strict accordance with the requirements of this Agreement, and ***in the event that there is a discrepancy, difference or ambiguity between the terms of this Agreement and any Drawings and Specifications, the interpretation imposing the greater obligation on Contractor shall control***." (emphasis added).

38.     Section 3.3D of the EPC Contracts provides that:

   "***Contractor shall perform***, or cause to be performed, all design and ***engineering work in accordance with Applicable Law and Applicable Codes and Standards***, and all Drawings, Specifications and design and engineering Work shall be signed and stamped by design professionals licensed in accordance with Applicable Law." (emphasis added).

39.     Section 8.2B of the EPC Contracts provides that Contractor remains responsible for breaches of its obligations under the EPC Contracts following Substantial Completion:

   "As between Owner and Contractor, Owner shall bear the risk of physical loss and damage to the Train [1, 2, and 3] Expansion and each component thereof … after Substantial Completion of the Train [1, 2, and 3] Expansion is achieved…. Notwithstanding the foregoing, ***under no circumstances shall this Section 8.2B be interpreted to relieve Contractor of its obligations or liabilities under this***

8

***Agreement***, including its ***obligations with respect to Defective Work*** and Corrective Work and its obligations under Section 20.1 and under Section 2.B of Attachment O." (emphasis added).

40.     Section 12 of the EPC Contracts establishes Contractor's Warranties for its Work.

Specifically, under Section 12.1B of the EPC Contracts, Contractor warrants that the Work "including Equipment, and each component thereof" shall be:

> "1. new, complete, and of suitable grade for the intended function and use in accordance with this Agreement;" "2. ***in accordance with all of the requirements of this Agreement***, ***including in accordance with GECP***, Applicable Law and Applicable Codes and Standards;" and "4. ***free from defects in design, material and workmanship***." (emphasis added).

41.     39.41. Consistent with Defendants' obligations under Section 2.3 of the EPC Contractors, Section 12.1C of the EPC Contracts provides:

> "Contractor shall, without additional cost to Owner, use all commercially reasonable efforts to obtain warranties from Subcontractors and Sub-subcontractors that meet or exceed the requirements of this Agreement; provided, however, ***Contractor shall not in any way be relieved of its responsibilities and liability to Owner under this Agreement***, regardless of whether such Subcontractor or Sub-subcontractor warranties meet the requirements of this Agreement, as ***Contractor shall be fully responsible and liable to Owner for its Warranty and Corrective Work obligations and liability under this Agreement for all Work***." (emphasis added).

42.     Section 12.1C of the EPC Contracts further provides:

> "All such [Subcontractor and Sub-subcontractor] warranties shall be ***deemed to run to the benefit of Owner*** and Contractor.  Such warranties, with duly executed instruments assigning the warranties to Owner, shall be ***enforceable by Owner upon Substantial Completion***.  All warranties provided by any Subcontractor or Sub-subcontractor shall be in such form as to permit ***direct enforcement by Contractor or Owner*** against any Subcontractor or Sub-subcontractor whose warranty is called for." (emphasis added).

43.     Section 12.1C of the EPC Contracts also establishes that:

> "***Contractor is jointly and severally liable*** with such Subcontractor or Sub-subcontractor with respect to such Subcontractor or Sub-subcontractor warranty."

44.     Section 12.3 of the EPC Contracts establishes Contractor's obligation to perform Corrective Work during the Defect Correction Period, which is defined as the 18-month period following Substantial Completion.  However, Section 12.3D of the EPC Contracts makes clear that Contractor remains responsible to Owner for failures to comply with its Warranties under the EPC Contracts:

> "Nothing contained in this Section 12.3 shall be construed to establish a period of limitation with respect to other obligations which Contractor might have under the Agreement.  Establishment of the **Defect Correction Period** relates only to the specific obligation of Contractor to perform Corrective Work, and **has no relationship to the time within which the obligation to comply with this Agreement may be sought to be enforced, nor to the time within which proceedings may be commenced to establish Contractor's liability with respect to Contractor's obligations other than specifically to perform Corrective Work**." (emphasis added)

### D.     Defects in the Trains' Motors

45.     On January 17, 2024, the Train 3 Propane Compressor 75 MW Motor ("75 MW Motor") tripped and remained offline, despite several attempts to restart it.  Initial investigations indicated that the likely cause of the trip was an electrical fault within a non-accessible portion of the 75 MW Motor.  A subsequent root cause analysis ("RCA") determined that the direct cause of the 75 MW Motor failure was an electrical short caused by loose hardware (bolts, nuts and washers) within the 75 MW Motor that dislodged from a protective panel where they were installed and fell into the 75 MW Motor windings.

46.     Specifically, the RCA identified the following root causes of the loose hardware:

   a.  _Deficient bolt/washer/nut retention assembly design_:  Design was not in accordance with manufacturer recommendations or Good Engineering and Construction Practices ("GECP").  Specifically, **locking nuts were not used to ensure that the hardware remained tightened in place** within the 75 MW Motor during normal operations within vibration integrity limits.  Additionally, **Nord-Lock washers were placed on only one side of the bolt step up**, which we understand **is not in accordance with**

*manufacturer recommendations* that require a Nord-Lock washer on both the bolt and nut sides for proper fastening.

b.  <u>Inadequate quality assurance/quality control during assembly</u>: There was **defective workmanship during assembly, including the use of improper parts, as well as differing metals for similar parts**.  For example, bolt assembly components in the 75 MW Motor were a mixture of stainless steel and carbon steel parts, and a large shim washer was found within the 75 MW Motor and is not an approved material in the bill of materials, nor is the use of shim washers part of the proper design of the bolt assembly.  In addition, **multiple bolts were identified as being inadequately torqued**.

47.    Similar defects have been identified in two other Train 3 motors, which will also require repairs.

48.    The RCA identified a separate Defect in the 75 MW motor that also requires repair in order to prevent premature failure in the future.  Specifically, significant partial discharge was found on the cable bundles going from the stator to the motor termination boxes in the 75 MW motor.  The cause of the discharge was determined to be the excessive length of the cables and the increased bend radius of the cabling.  Cable sheath and insulation damage due to excess partial discharge was also found in the other Train 3 motors, requiring repairs to all three Train 3 motors before they could be placed back into service.

49.    The same 75 MW Motor are utilized in Trains 1 and 2 of the LNG Facility.  Given the prevalence of the Defects in the Train 3 motors, Plaintiffs believed that it was likely that the motors in Trains 1 and 2 are affected by the same Defects.

50.    As a result, Plaintiffs implemented enhanced monitoring of Trains 1 and 2 and planned to perform inspections of Trains 1 and 2 after the repairs to Train 3 were completed. However, the enhanced monitoring performed on the Train 1 and 2 motors identified an increase in partial discharge and current abnormalities in one of the Train 2 motors.  As such, Train 2 was taken offline for inspection prior to the completion of the repairs to Train 3.

51.    Inspections of the Train 2 motors revealed additional workmanship issues, even

11

moreso than those found in the inspections of the Train 3 motors.  Not only did all 6 bolt assemblies dislodge from the protective micarta panel (as they did in the damaged Train 3 motor), but the micarta panel itself partially separated due to an approximately two-foot long bolt assembly dislodging from the underside of the panel.  While one of the two-foot long bolt assemblies remained in place, the other bolt assembly became fully dislodged from the protective panel and appears to have dropped into the rotor portion of the motor and sheared into numerous smaller pieces (which caused additional damage to the motor internals).

52.     The inspection of the Train 2 motor also identified substantial damage to the insulation on the motor's stator.  The preliminary boroscope inspection of Train 2's 12K-31 motor identified that some bolt assemblies have dislodged from the micarta panels.

53.     Given the extent of the faulty workmanship and poor condition of the bolt assemblies and cabling supports identified in Train 2, Plaintiffs made the decision to take Train 1 offline immediately to mitigate any possibility of damage to the Train 1 motors.

**E.     Contractor's Gross Negligence in Connection with the Motor Defects**

54.     On December 19, 2023, Defendants issued their "Engineering Evaluation Letter" for the Main Refrigerant Compressors.   In the Engineering Evaluation Letter, Defendants acknowledged awareness of the possibility of problems during manufacturing due to the motors' size:

> As demonstrated by the information mentioned elsewhere in this report, the electric drives, ***drive motors***, and drive transformers ***will be among the largest ever built*** for these services. Accordingly, there is some ***possibility that problems will occur during manufacturing*** or testing….

> These drives are not only large; they are also non-linear electrical loads which ***present serious power system challenges*** even when such loads are relatively small.

(emphasis added).

55.     Additionally, the Conclusions in Defendants' December 19, 2023 Engineering Evaluation Letter recognized the serious challenges presented by the complexity of the drive equipment and that Defendants must actively manage those risks:

> A job of this **complexity and "first-of-a-kind" challenges** must be **executed carefully and with more technical due diligence than** is typical for projects with **more conventional drive designs**. Otherwise, critical issues may be overlooked or inadequately addressed.

> These are all serious considerations that **must be carefully managed in an aggressive and disciplined way** going forward; and the **support of ZCJV upper management may be required** to facilitate some of this, especially with regard to elevating the involvement of Centerpoint.

(emphasis added).

56.     Each of the three trains uses three 75 MW motors, and each motor in turn powers three propane and mixed-refrigerant compressors.  The motors are massive and, as Defendants acknowledged, were among the largest to ever be built.  As a result, defects in the motors like those experienced at the LNG Facility necessarily involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others who would be working at the LNG Facility.

57.     Moreover, as evidenced by their Engineering Evaluation Letter, Defendants had the subjective awareness of the potential for problems during the manufacture of the motors due to their massively large size well before the manufacturing process even began.  Defendants were also subjectively aware that the size and complexity of the drive equipment presented "first-of-a-kind" challenges that must be "carefully managed in an aggressive and disciplined way."

58.     The subjective awareness of those risks would and should have caused a reasonably prudent EPC Contractor to implement adequate inspections, quality assurance and quality control procedures pursuant to Good Engineering and Construction Practices to safeguard against those

13

risks.  In wanton disregard for their obligations under the EPC Contracts, Defendants failed to implement such procedures.

59.     Instead, two months later in their February 14, 2014 letter, Defendants informed Plaintiffs that they had "determined both [GE and Siemens] vendors demonstrated overall technical acceptability for supply of the equipment for the FLNG Liquefaction Project."  And while Defendants recommended Siemens as the Main Refrigerant Compressor equipment vendor, they did so primarily due to Siemens' lower total cost and improved annual electrical usage.

60.     On March 27, 2014, the parties entered into a change order to increase the Contract Price by $5,956,090 to compensate Defendants for the increased costs of the GE motors.  The change order did not otherwise impact Defendants liability or obligations under the EPC Contracts.

61.     Defendants failed to adequately review the design for the motors and identify the bolt assembly design defect described above.  The manufacturer of the Nord lock washers recommended that washers be installed on both the bolt and nut side of the assembly.  However, locking washers were only used on one side of the bolt.  A simple review of the design would have identified that design defect.  However, Defendants' failure to review the design directly resulted the bolts coming loose, falling out, and damaging the motors, as depicted below:



 

62.     Likewise, Defendants failed to implement adequate quality assurance and quality control procedures to identify and prevent poor workmanship during the manufacture of the motors.   Insufficient torquing of the bolts could and should have been identified by adequate quality assurance and quality control procedures due to the obvious lack of torque markings on the nuts.

63.     Further, the motors were manufactured using irregular parts and non-specified materials.   In fact, the workmanship was so sloppy that a large interior diameter washer was found inside one of the motors being used as "shim" washer.   Further, dissimilar metals were found to be used on the nut-bolt systems (*e.g.*, carbon steel components improperly being mixed with stainless steel components).   If Defendants had performed shop inspections during fabrication, these obvious defects could and would have been identified and corrected.

64.     The motors were fabricated off-site and delivered to the Project site as intact units.   The motor casings were not scheduled to be opened for the motors to be serviced until approximately nine years after installation.   As a result, adequate shop inspections by Defendants represented the only opportunity to discover and correct these defects before the motors were put

into service.   Due to the conscious indifference of Defendants, the motor defects were not identified before the motors were installed at the LNG Project.

65.   As discussed above, the motor defects were not isolated issues, but rather systemic and pervasive defects in the bolt assemblies and cabling supports impacting all nine 75 MW motors in all three Trains at the LNG Facility.   And despite Defendants' subjective awareness of the risks of problems during the fabrication of the motors, Defendants failed to implement adequate inspections, and quality assurance and quality control procedures in conscious indifference to Plaintiffs' rights under the EPC Contracts and in conscious indifference to the safety and welfare of those operating the LNG Facility.

66.   Further, as agreed upon in Section 2.3 of the EPC Contracts, Defendants are fully responsible for the acts and omissions of their subcontractors.   The gross indifference by which General Electric designed and manufactured the motors, particularly as to the defective nut-bolt assemblies, lack of proper torquing, the improper use of unspecified materials (*e.g.*, the shim washer), the improper use of dissimilar metals (*e.g.*, mixing stainless steel and carbon steel components) and the excessive cable lengths and bend radii, are all clear indications of the grossly negligent acts of General Electric, which are contractually imputed to the Defendants.

67.   Additional information regarding the gross negligence of Defendants and General Electric relating to the design, manufacturing and installation specifications that were supposed to be utilized in the design, manufacturing and assembly of these motors is not within Plaintiffs' possession, custody, or control.   Such information is expected to be within the possession of Defendants and would only become available to Plaintiffs during discovery.   As a result, on information and belief, further instances of Defendants' conscious disregard for complying with the expected and required standards of care will be obtained through discovery.

**F.      Plaintiffs' Damages**

68.      FLIQ3 has incurred damages, costs, losses, and expenses as a result of the failure of the 75 MW motor on Train 3 and Contractor's failure to comply with its obligations and Warranties under the EPC Contracts, including investigatory and repair costs, removal and transportation costs for the 75 MW motor to be taken from its installed location to and from the off-site facility for repairs, costs to install a spare 75 MW motor into Train 3, and other costs and expenses incurred by FLIQ3 as a result of the Defects.  FLIQ3 also incurred additional damages, costs, losses and expenses to carry out preventative maintenance on the other Train 3 motors.

69.      FLIQ1 and FLIQ2 have or will incur similar damages, costs, losses and expenses as a result of the Contractor's failure to comply with its obligations and Warranties under the EPC Contracts in connection with the motors on Trains 1 and 2.

70.      Because of Defendants' breaches, it has been necessary for Plaintiffs to retain the undersigned attorneys to prosecute this claim.

71.      All conditions precedent to filing this action have or will soon occur.

V.      CAUSES OF ACTION

**A.      Breach of the EPC Contracts**

72.      Plaintiffs incorporate and reallege the preceding allegations as if fully set forth below.

73.      Plaintiffs entered into the EPC Contracts with Defendants, which constitute valid and enforceable contracts.

74.      Defendants have breached their substantive performance obligations under Articles 2 and 3 of the EPC Contracts, as well as their Warranty obligations under Article 12 of the EPC Contracts, by at least the following acts and omissions of Contractor or its subcontractors:

      a.    deficient bolt/washer/nut retention assembly design and its inadequate quality assurance/quality control during assembly,

      b.    excessive cable length and increased bend radius of cabling resulting in significant partial discharge on the cable bundles,

      c.    deficient bolt assemblies, causing the bolts to become dislodged from the micarta panels and separation of the micarta panels themselves, and

      d.    dissimilar and improper unspecified materials used in the fabrication of the motors.

75.    Defendants' and their subcontractors' acts and omissions constitute a breach of their obligations under the EPC Contracts, including, *inter alia*, the obligations to:

      a.    perform engineering, design, manufacture and fabrication "in accordance with the requirements of this Agreement" under Section 3.1A;

      b.    "perform the Work in accordance with GECP" under Section 3.1A, which includes "reasonable and prudent practices, methods, skill, care, techniques and standards" for the engineering, design and construction of LNG facilities;

      c.    "procure" and "assemble, erect and install all Equipment" under Section 3.2A;

      d.    "provide … inspection and quality control services" under Section 3.2B;

      e.    inspect the Work of their Subcontractors and "ensure that such work meets all the requirements of this Agreement" under Section 3.2D;

      f.    "perform, or cause to be performed, all design and engineering Work in accordance with this Agreement" under Section 3.2R and the equivalent

language of Section 3.3A;

g.      comply with their Warranty that the Equipment and each component thereof shall be "new, complete and of suitable grade for the intended function and use in accordance with this Agreement" under Section 12.1B(1);

h.      comply with their Warranty that the Equipment and each component thereof shall be "in accordance with all of the requirements of this Agreement, including in accordance with GECP" under Section 12.1B(2); and

i.      comply with their Warranty that the Equipment and each component thereof shall be "free from defects in design, material and workmanship" under Section 12.1B(3).

76.    Plaintiffs have been damaged and are entitled to recover all amounts caused by Defendants' breaches of the EPC Contracts.

77.    In addition, because Defendants' and their subcontractors' acts and omissions constitute gross negligence, Plaintiffs are entitled to recover their lost profits.

78.    Because of Defendants' breaches, it has been necessary for Plaintiffs to retain the undersigned attorneys to prosecute this claim.  Pursuant to Texas Civil Practice & Remedies Code § 38.001, Plaintiffs are entitled to recover its reasonable and necessary attorneys' fees.

## VI.    REQUEST FOR RELIEF

79.    Plaintiffs respectfully requests that they be granted judgment including the following relief:

a.      all damages caused by Defendants' breaches of the EPC Contracts;

b.      pre-judgment and post-judgment interest at the highest allowable rate;

c.      costs and reasonable and necessary attorneys' fees; and

d.      all other relief to which Plaintiffs are entitled.

Respectfully Submitted,

s/ *Mike Stenglein*
Mike Stenglein
Texas Bar No. 00791729
mstenglein@kslaw.com
Christopher H. Taylor
Texas Bar No. 24013606
ctaylor@kslaw.com
KING & SPALDING LLP
500 West 2nd Street, Suite 1800
Austin, Texas 78701
(512) 457-2000 (telephone)

Michael Fishel
Texas Bar No. 24082998
mfishel@kslaw.com
Hale Neilson
Texas Bar No. 241116820
hneilson@kslaw.com
KING & SPALDING LLP
1100 Louisiana St., Suite 4100
Houston, TX 77002
(713) 751-3200 (telephone)

**ATTORNEYS FOR PLAINTIFFS FLNG LIQUEFACTION, LLC; FLNG LIQUEFACTION 2, LLC; AND FLNG LIQUEFACTION 3, LLC**

## CERTIFICATE OF SERVICE

I certify that on December 3, 2024, I caused a true and correct copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on all parties registered to receive notice through the Court's ECF service.

s/ *Mike Stenglein*
Mike Stenglein